**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARVIN DOVBGERG**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**ASD SLEEP, LLC, d/b/a AMERICAN SLEEP DENTISTRY**,<br><br>Defendant. | Case No.   2:26-cv-4804<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Marvin Dovberg, individually and on behalf of all similarly situated persons, alleges the following against Defendant ASD Sleep, LLC, d/b/a American Sleep Dentistry ("ASD" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by his counsel and review of public documents as to all other matters:

### I.    INTRODUCTION

1.     This class action lawsuit arises out of ASD's unlawful use of third-party tracking technologies by data brokers such as Alphabet, Inc. ("Google") and Meta, Inc. ("Meta") to surreptitiously intercept and disclose its users' private and protected communications, including communications concerning highly sensitive personal health information, to third parties without users' knowledge or consent.

2.     By purposely embedding and deploying third party tracking technologies on ASD's website, available at www.americansleepdentistry.com (the "Website"), ASD engages in the unauthorized disclosure of its users' highly sensitive protected health information ("PHI") and

personally identifiable information ("PII" and together with PHI, "Sensitive Health Information") to third parties including, but not limited to, Google. Such disclosures of PHI and PII violate state and federal law.

3.      ASD states on its website that "[t]here are only 2 products that are FDA cleared to eliminate or reduce sleep apnea: An oral appliance or a CPAP."[1] ASD offers a sleep apnea appliance which it says is "preferred 8 out of 10 times over CPAP."[2] ASD's device works by adjusting "the position of the bottom jaw forward, preventing muscle collapse" that causes sleep apnea and ensuring that "the airway is sustained open."[3]

4.      On its Website, ASD encourages prospective patients at the top of its homepage that "ASD dentists bill your Medical Insurance and Medicare, so you pay little or ZERO!"[4] ASD's website provides a form for a user to "Verify if my Insurance or Medicare covers a sleep appliance!," asking for the patient's full name, email address, and cell number.[5]

5.      Clicking the "Terms & Conditions" button on ASD's website brings up a 16-page PDF titled "Patient Packet," the first section of which is titled "1.0 Notice of Privacy Practices," and the first paragraph of section 1.0 reassures patients that ASD will safeguard their private information:

**Privacy Promise**

American Sleep Dentistry ("ASD") understands that your medical and health information is personal. Protecting your health information is important. We follow strict federal and state laws that require us to maintain the confidentiality of your health information.

---

[1] *Homepage*, AMERICAN SLEEP DENTISTRY, www.americansleepdentistry.com (last visited Jul. 18, 2026).

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.*

2

ASD warns patients that they may "Share information with third parties who assist us with treatment, payment, and healthcare operations" but reassures patients that "[o]ur business associated [sic] must protect your information by following our privacy practices." The policy does not mention that that patients' health information will be provided to Google and other third parties. And it states clearly that "[a]ll other uses and disclosures, not described in this notice, require your signed authorization." ASD also has a page on its website titled "Privacy Policy" which appears to contain the same information.[6]

6.      Yet, unbeknownst to patients who seek treatment through ASD dentists, ASD intercepts the contents of this communication, including the patient's full name, email address, and cell number, (together, with the fact that the user is seeking to verify insurance coverage for ASD's sleep apnea appliance, the "Sensitive Health Information") and discloses the information to third parties, including Google and Meta, through ASD's use of third-party tracking technologies ("Tracking Tools").

7.      Health information is highly regulated by both state and federal law, including HIPAA, which imposes criminal penalties on disclosing individually identifiable health information ("IIHI") to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[7] Accordingly, ASD's disclosure of Plaintiff's and each Class Members' Sensitive Health Information constitutes a violation of HIPAA.

---

[6] *Notice of Privacy Practices*, AMERICAN SLEEP DENTISTRY, www.americansleepdentistry.com (last visited Jul. 18, 2026).

[7] 18 U.S.C. § 1320d-(6).

8.    ASD installed the Tracking Tools with the intent to collect and disclose users' Sensitive Health Information for purposes of financial gain.

9.    Plaintiff and Class Members never consented to, authorized, or otherwise agreed to allow ASD to disclose their PHI and PII to anyone other than those reasonably believed to be part of ASD, acting in a healthcare-related capacity. Despite this, ASD knowingly and intentionally disclosed Plaintiff's and each Class Members' PHI and PII to Google, Meta and other third parties to use *without restriction*.

10.    Given Google's status as one of the world's largest online advertising companies, Plaintiff's and each Class Members' PHI and PII can and will likely be further used by or exposed to additional third parties.

11.    Online advertising giants, like Google and Meta, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives like their PHI and the products they use to treat their health conditions. This information is then used as fuel for a massive, targeted advertising enterprise.

12.    Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. If Google and Meta receive information that a person is concerned about their health, they will collect that information and allow their clients to use that information to stream ads related to health treatments and services to that person's computers and smartphones.

13.    Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools").

14.    Armed with Google's Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

15.    But, in exchange for access to Google's Business Tools, website operators install Tracking Tools, *i.e.*, Google's surveillance software, on their website, including tracking pixels ("Pixels") and third-party cookies that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user called a Customer ID ("CID"), regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

16.    In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

17.    ASD is one of the companies that has chosen to prioritize its marketing efforts and profits over the privacy of its users and potential patients by installing Google's Tracking Tools on its Website.

18.    Plaintiff and each Class Member used the Website and had their personal Sensitive Health Information tracked by ASD using the Tracking Tools. However, ASD ***never*** obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties, and never obtained the "signed authorization" it promised was required for such

disclosures. At all times relevant to this action, Plaintiff and Class Members gave no informed consent for information about their Sensitive Health Information to be transmitted to third parties, including Google, the largest advertiser and compiler of user information.

19.     As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) loss of benefit of the bargain; (iv) diminution of value of the Sensitive Health Information; and (v) continued and ongoing risk to their Sensitive Health Information. As a result of these injuries, Plaintiff and class members are entitled to their actual damages, nominal damages, and/or statutory damages.

20.     Therefore, Plaintiff seeks, on behalf of himself and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: (i) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq*.; (ii) Violations of the Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. C.S. § 5701 *et seq.*; (iii) Invasion of Privacy; (iv) Negligence; (v) Breach of Contract and/or Breach of Implied Contract; and (vi) Unjust Enrichment.

## II.     PARTIES

***Plaintiff Marvin Dovberg***

21.     Plaintiff Marvin Dovberg is a citizen of the State of Pennsylvania, residing in Montgomery County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

22.     In or around February 2026, Plaintiff utilized the Website on his personal electronic devices to schedule a sleep consultation with ASD. Plaintiff completed his initial sleep consultation on February 26, 2026, and conducted a sleep evaluation with Defendant which revealed evidence of Obstructive Sleep Apnea.

23. Plaintiff expected that Defendant would share information related to his appointment with other members of his medical team. But Plaintiff did not expect and did not authorize Defendant to disclose any aspect of his communications with Defendant through the Website to Google or other third parties, he did not authorize Defendant to inform Google or other third parties that he was seeking to be evaluated for ASD's sleep apnea device, and he did not authorize Defendant to share that information along with his full name and email address.

24. Yet, unbeknownst to Plaintiff, the Website transmitted his Sensitive Health Information that he communicated while using the Website.

25. After providing his Sensitive Health Information to Defendant through the Website, Plaintiff immediately began seeing targeted online advertisements for health services and products related to sleep apnea.

### *Defendant American Sleep Dentistry*

26. ASD Sleep, LLC d/b/a American Sleep Dentistry is a limited liability company incorporated in the State of Utah, with its principal place of business located at 1289 S Interstate Drive, Cedar City, Utah 84720.

### III.    JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiff is a citizen of Pennsylvania, Defendant is a citizen of Utah, and class members are citizens of the various states. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has

7

supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

28.    This Court has personal jurisdiction over Defendant because it has made or established contacts in the State of Pennsylvania and in this judicial district sufficient to permit the exercise of personal jurisdiction, and because this lawsuit arises out of those contacts. In particular, Defendant has conducted or arranged medical treatment of Plaintiff in this state, and this case arises out of Defendant's mistreatment of Plaintiff's federally protected private health information.

29.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.  BACKGROUND ON TRACKING TECHNOLOGY

30.    In order to use Google's and Meta's Business Tools, Defendant installed Google's and Meta's Tracking Tools, including tracking Pixels, onto the Website.

31.    Pixels are one of the more common forms of tracking technology used by website operators to track users' behavior, interactions, and the content of their communications online.

32.    Pixels are typically snippets of code embedded on a website that surreptitiously intercept a user's actions, including private communications on that app or property. The FTC describes pixels as "small piece[s] of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews." [8]

33.    Pixels can collect a shocking amount of private information regarding an individual's communications with websites, including the webpages viewed by the user, the

---

[8] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Mar. 3, 2026).

amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form—all transmitted in real-time as the user navigates a website.[9]

34.    Website owners, like Defendant, can use pixels to send additional information specific to their website. As described herein, Defendant configured the pixels at issue in this case to transmit and intercept Personal Health Information.

35.    As the Federal Trade Commission ("FTC") explains, one of the purposes of using pixels is to monetize consumers' data:[10]

> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns . . . Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.

36.    Particularly problematic, consumers are generally unaware that these pixels are present because they are invisible. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with . . . Academic and public reporting teams have

---

[9]    *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited June 25, 2026); Tom Kemp, *"Oops! I Did It Again" ... Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited June 25, 2026).

[10]    *Id.*

found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[11]

37.     As described above, Defendant makes extensive use of Google Analytics, Google's tracking tool. Google is especially problematic because it is of the largest advertising platforms in the world. Google uses the intercepted information for its own commercial purposes, including augmenting the profiles it maintains about individuals and improve its technology for targeting individuals with ads both on properties Google owns and operates and other web properties that participate in its ad networks.

### i.     The Pixels Installed on the Website Transmit Personally Identifiable Information to Google and Meta

38.     Every website is hosted by one or more computer "servers" that provide the website's contents.

39.     To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.  Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

40.     Communications between website servers and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

---

[11] *Id.*

41.     Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[12] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[13] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[14]

42.     When a Google or Meta user logs onto their account, their web browser records a Google or Meta tracking cookie.[15] This cookie includes a specific line of code that links the web browser to the user's Google account.[16]

43.     Google and Meta use their Pixels to acquire information from the browser without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

44.     Simultaneously, the Pixels, like those installed on the Website, request identifying information from any cookies previously saved on the user's web browser, with Google's Pixels requesting identifying information from previously saved Google cookies and Meta's Pixels doing the same with Meta's cookies.

---

[12] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited June 25, 2026).
[13] *Id*.
[14] *Id*.
[15] Cyphers & Gebhart, *supra* note 10.
[16] *Id*.

45.     The Pixels then combine the data received from the browser with the data acquired from the cookies, and instruct the web browser to transmit the information back to Google and Meta. As a result, Google and Meta can link all of the user information collected by their Pixels to the user's identity, via the user's Google or Meta profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google or Meta, can know the user's identity.

46.     A remarkable number of Americans possess a Google or Meta account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans, over 80-percent of Americans use YouTube, Google's video client; over 70-percent report using Meta-owned Facebook.[17] When these users visit a website, like those on which the Website has been installed, that utilizes a Google or Meta Pixel, any information collected by those Pixels can be linked to the user's identity through the Google and Meta cookies saved on the user's web browser.

47.     However, it is not only Google and Meta account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google and Meta utilize sophisticated data tracking methods to identify even those few users who do not have a Google or Meta accounts.

---

[17] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited June 25, 2026) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited June 25, 2026); Jeffrey Gottfried and Eugene Park, *Americans' Social Media Use 2025*, Pew Research (Nov. 20, 2025), available at https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/ (last visited June 25, 2026).

48.     Google's and Meta's Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

49.     An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[18] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[19] And, as Google and Meta continuously compile user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

50.     However, among the most useful pieces of identifying information are full names and email addresses. When Google and Meta receive those identifiers in communications, they are able to improve the accuracy of their browser fingerprints, not just on the site which discloses names and email addresses, but on all other sites used by the same individual.

### B.  GOOGLE'S TRACKING TECHNOLOGY

51.     Google is one of the largest digital advertiser platforms in the country, with a market capitalization of over $3 trillion dollars. Google accounts for 26.8% of the total digital advertising

---

[18] Cyphers & Gebhart, *supra* note 10.

[19] *Id*.

revenue generated in the United States.[20] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[21]

52.     Google "make[s] money" from its "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[22]

53.     Google offers various tracking technologies, including Google Analytics and Google Ads, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google Analytics also improve the company's advertising network and capabilities by providing direct pipeline to Google of data that it uses to enrich the vast amount of interconnected data it maintains about them.

54.     Google advertises Google Analytics and other business tools to website operators to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and

---

[20] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited June 25, 2026).

[21] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited June 25, 2026).

[22] ALPHABET INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

14

"[g]et insights only Google can give."[23] Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third-party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[24]

55.     Google also admits that it uses the information collected from third-party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[25]

56.     While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. The vague descriptions of Google's data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendant was part of Google's surveillance network. Moreover, as Defendant does not disclose its use of Google's Tracking Tools, Plaintiff and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

---

[23]     *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited June 25, 2026).

[24] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited June 25, 2026).

[25] *Id*.

57.   Google aggregates the user information that it collects from third-party websites into "advertising profiles" consisting of all of the data that it has collected about a given user.[26] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[27]

58.   Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[28] and Google trackers are present on 74-percent of all web traffic.

59.   Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

   a.   Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[29] For example, when an online shopper

---

[26] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at* https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[27] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited June 25, 2026).

[28] Narseo Vallina-Rodriguez & Srikanth Sundaresan*, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited June 25, 2026).

[29] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited June 25, 2026).

searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[30]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[31]

c. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[32] In fact, Google advertising trackers were found on 73-percent of pornography websites.[33]

60.     This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmidt, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[34]

61.     In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[35]

---

[30] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited June 25, 2026).

[31] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at* https://pubmed.ncbi.nlm.nih.gov/31002321/.

[32] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at* https://journals.sagepub.com/doi/10.1177/1461444820924632.

[33] *Id*.

[34] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited June 25, 2026).

[35] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited June 25, 2026) ("Google Analytics gives you the tools, free of charge"),

62.     When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy.

63.     For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[36]

64.     Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[37]

65.     And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[38]

66.     Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours—or 30.5 working days—to read the privacy policy of every new website that they visited in a single year.[39]

---

[36]     *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited June 25, 2026).

[37] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[38] *Id*.

[39] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

### C.  GOOGLE ANALYTICS

67.     Google Analytics is deployed by dropping a piece of Google-engineered code on a given web property or app. This code intercepts and analyzes users' interactions with the web site or app, in real time, while the user visits or uses the web site or app, including what URLs are loaded, what users click on, what users type in text fields, and often, how long a user spends on specific pages.

68.     Google Analytics is configurable, and will only disclose to Google the information that it is configured to disclose. However, if the browser is closed before a disclosure is made, the disclosure will not occur. To ensure that nothing is missed, the Google-engineered code continuously reads and analyzes communications between the web users and the web site as they occur. While performing this analysis, the Google-engineered code analyzes the substance of those communications to determine when those communications trigger the configured criteria for a disclosure to Google.

69.     The code also collects multiple pieces of identifiable information so that Google can connect that data within its systems to a specific individual. This includes multiple cookie values Google creates for this precise purpose, along with device information, such as unique ad identifiers and settings used to create a digital "fingerprint" for people, IP addresses that tie them to specific locations (like their home), and more. This does not require a person to have a Google account, to be signed into their Google account, or using a Google product. Google has a special set of cookies and systems created specifically to track and identity individuals not signed into a Google product at the time they use a website, or who attempt to use private browsing mode.[40]

---

[40] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

70.    Google provides web property owners with analytics about their sites and apps based on this data, including reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits), and demographics (e.g., classify the customer's users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities). However, the main purpose of Google's tracking technologies, including Google Analytics, is to promote targeted ads both on Google.com (so called "search ads" or "Google ads") or other Google owned and operated products (e.g., YouTube), and across Google's display network (Google "display ads") which include thousands if not millions of web properties.

71.    In addition to providing customers with analytics ads services, Google also uses the data collected through Google Analytics and other tracking technologies for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users. Thus, the data Defendant disclosed, and allowed Google to intercept, is actively used by Google to improve and serve advertisements to other individuals with sleep apnea or sleep apnea symptoms. And individual consumers who have their data disclosed by one entity (for instance, Defendant) will see ads for other entities based on their data as a result of Google's advertising system.

72.    Further, customers like Defendant can also send data to Google through a server-to-server connection or through a third-party intermediary. This allows customers like Defendant to disguise what data it sends to Google because no one (other than these parties) can observe what data is sent server-side.

### D.  META'S TRACKING TECHNOLOGY

73.     Meta operates the world's largest social media company and generated $164 billion in revenue in 2024, almost all of which comes from advertising. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level.

74.     In conjunction with its advertising business, Meta encourages and promotes entities and web property owners, such as Defendant, to utilize its "Business Tools" to gather information about people, identify, target, and market products and services to them.

75.     One such Business Tool is Meta Pixel (formerly Facebook Pixel). Upon its release in 2015, Meta touted Meta Pixel as a new way to gain insights about how people use your website. The "pixel" itself is a small snippet of website code written by Meta engineers. To use the Meta Pixel, an advertiser places a pixel (i.e., a code snippet) on their website.

76.     The Meta Pixel is designed to "track[] the people and type of actions they take" across all pages accessible on a web property (e.g., such as all pages of the Website) with a single code snippet.[41] When a user accesses a webpage on a web property using Meta Pixel, their communications with *every* webpage are instantaneously and surreptitiously intercepted and recorded by Meta's code and sent to Meta's servers.

77.     Through this technology, Meta intercepts information about each page a user visits, what buttons they click, as well as specific words they type into form boxes on the web property. Meta also receives "events" data reflecting data fields identified by the web property owner, which can reveal even more information about the individual and their specific interactions or communications.

---

[41] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting (last visited January 14, 2026).

78.     Meta Pixel is configurable, and will only disclose to Meta the information that it is configured to disclose. However, if the browser is closed before a disclosure is made, the disclosure will not occur. To ensure that nothing is missed, the Meta Pixel code continuously reads and analyzes communications between the web users and the web site as they occur. While performing this analysis, the Meta Pixel code analyzes the substance of those communications to determine when those communications trigger the configured criteria for a disclosure to Meta.

79.     The information Meta receives via the Meta Pixel includes identifying information that is sufficient to identify a particular individual either directly (e.g., by name or email) or in combination with other information, like unique devices identifiers, cookie values, IP addresses, already in Meta's possession (e.g., either because it was collected from a another web property using its Tracking Technology or the individuals' use of a Meta owned and operated app or property).

80.     For instance, Meta uses "[a]dvanced matching" techniques to link the data received via the Meta Pixel to Facebook users[42] and also analyzes information entered in online forms to uncover further PII about the user, such as their email address, to further identify each respective individual.[43]

81.     Meta stores the data captured by its Tracking Technology on its own servers for its own commercial purposes. Meta then provides the web property owner whose property this information is recorded from with access to analytics generated from the data recorded (e.g., which users took certain actions on any given webpage, how many, etc.). This is accessed through the

---

[42]     *Advanced     Matching*,     META     https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/ (last visited June 25, 2026).

[43]     *About     advanced     matching     for     web*,     META https://www.facebook.com/business/help/611774685654668?id=1205376682832142 (last visited June 25, 2026).

web property owner's Facebook Ads Manager account, as well as potentially through the Facebook Events Manager.[44] The data available to the web property owner is a limited set and *does not* include all information Meta has about the individuals whose communications and actions it recorded through its Tracking Technology.

82.     In this way the Meta Pixel has two purposes: (1) it enriches Meta's ability to collect data about individuals across the web, and enriches its profiles about them, and (2) facilitates web property owners spending money on Meta ads. For instance, Meta encourages website owners to create "custom audiences" of users who have taken the same or similar actions on the website based on the data received through the Meta Pixel to target them directly with ads. Meta also uses this audience to "identify other Facebook users" similar to them (i.e., "lookalikes") and to "target [those similar users] with [the website owner's] ads."[45] Meta uses the full complement of data in its possession—not just that received from the web property—to identify these individual targets.

83.     Meta also uses the data it receives through the Meta Pixel to fuel its own advertising business. Meta's documentation confirms that Meta feeds the data received through the Meta Pixel into "machine learning models" that "consider that person's behavior" to predict who is likely to respond to any given ad, making its advertising services even more lucrative.[46] These machine learning models "learn[]" more about individuals as they "receive[] new data."[47] Thus, each person whose data Meta receives through the Meta Pixel directly contributes to how successful Meta is at targeted advertising and contributes to Meta's ad revenue. And individual consumers who have

---

[44]     *Conversion     Tracking*,     META     https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited June 25, 2026).

[45] *Id.*

[46] *Good Questions, Real Answers: How Does Facebook Use Machine Learning to Deliver*, META (June 11, 2020), https://www.facebook.com/business/news/good-questions-real-answers-how-does-facebook-use-machine-learning-to-deliver-ads.

[47] *Id.*

their data disclosed by one entity (for instance, Defendant) will see ads for other entities based on their data as a result of Meta's advertising system.

84.    In true "move fast and break things" spirit, Meta built these systems to sell ads without incorporating any way to limit the use of data collected through Meta Pixel, or prevent Meta Pixel from acquiring sensitive data. According to leaked internal Meta documents, Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'" Thus, any data the Meta Pixel intercepted from the Website was incorporated into Meta's ads systems and models to benefit its business.

85.    Meta's customers, like Defendant, can also send data to Meta through a server-to-server connection or through a third-party intermediary (e.g., sending data to a data platform like AppsFlyer or mParticle which then routes traffic to Meta and others). This allows customers like Defendant to disguise what data it sends to Meta because no one (other than these parties) can observe what data Defendant uploads directly to Meta for use in ads, or sends through third parties. Which data Defendant uploaded to Meta directly or sent through third parties and how that data is used, accordingly, will be uncovered during discovery.

### E.  DEFENDANT'S WEBSITE DISCLOSES PHI TO GOOGLE AND META

86.    Defendant owns and/or operates the Website, available at www.americansleepdentistry.com. Defendant uses the website to attract patients for its "FDA cleared sleep appliance" to treat "sleep apnea without a CPAP."

87.    When Plaintiff visited Defendant's website in or around February of 2026, he was unaware that Defendant's website contained third-party tracking technologies. Accordingly, Plaintiff was unaware that the Website intercepted, analyzed, and disclosed his personally identifiable health information to Google and Meta.

88.     ASD offers one and only one type of product through the Website: its sleep apnea devices. Accordingly, the fact that Plaintiff and Class Members scheduled an appointment with Defendant through the Website indicates that a person either has sleep apnea or seeks to be evaluated for sleep apnea, and that the person is at least considering using one of Defendant's products to treat their actual or suspected sleep apnea. ASD intercepts and discloses Private Health Information to Google using the Tracking Tools.

89.     This is exactly what the Website intercepts, analyzes, and discloses: personally identifiable health information about patients' condition and treatment plan to Google and Meta. The discussion below shows how the Website works. Though the information in the disclosures below is not Plaintiff's information, upon information and belief, Defendant's website operated in the same manner, and disclosed the same categories of information, when Plaintiff visited the website.

90.     Upon opening the Website, Defendant offers prospective patients the chance to "[s]chedule a FREE sleep consultation with an ASD credentialed dentist" and suggests that prospective patients verify whether their insurance covers ASD's appliance.

/

/

/

/

/

/

/

/



**Figure 1:** Defendant's Home Page

91.     For example, when the value "TestFirst TestLast" is entered in the Full Name field the value test@email.com is entered in in the Email field, and a dummy number in the Cell Number field, and the "Verify my Coverage" button is clicked, the user will be brought to the next screen to select a date and time for a Virtual Sleep Consultation.

26



**Figure 2:** Scheduling Page

92.     At this stage, Defendant intercepts a patient's full name and email address and then discloses that information to Google. Defendant simply could not have made it easier for Google to identify the patient.

93.     In the test scenario discussed above, Google Analytics sent the following information in a message to google-analytics.com:

| dl | https://www.americansleepdentistry.com/teleHealthConfirmation?e=19EDBC4F545828&leadId=501533&email=test@email.com&name=TestFirst%20TestLast&action=schedule&type=vsc |
| dr | https://www.americansleepdentistry.com/scheduleTeleHealth;jsessionid=BDA817D263E64D4AAABB0404E3AD92F0 |
| dt | American Sleep Dentistry |
| en | generate_lead |

**Figure 3**: Information intercepted by Defendant and disclosed to Google

94.    This disclosure shows that a patient visited the Schedule Tele Health page for American Sleep Dentistry, that the patient's email address is test@email.com, and that the patient's name is TestFirst TestLast, the exact information entered in the test scenario. ASD directly discloses patients' PHI.

95.    The fact that some extra characters have been added does not change this disclosure. The text "&email=test@email.com&name=TestFirst%20TestLast&action=schedule" simply uses the character "&" to separate different fields, and uses "%20" to replace a space. Accordingly, the text shows:

    a.    email=test@email.com

    b.    name=TestFirst TestLast

    c.    action=schedule

96.    ASD does not wait for a "signed authorization" from the patients, as it promises in its Terms and Conditions, before making these disclosures.[48] In fact, ASD does not wait for any affirmative representation of consent. Instead, ASD configured the Website to initiate tracking using the Tracking Tools immediately when the Website loads.

97.    Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to intercept and disclose Sensitive Health Information that patients communicated to ASD making appointments for treatment.

---

[48] See Supra, ¶¶ 5-6.

28

98.     Further, the information that was transmitted to Google was accompanied by identifiers linking the Sensitive Health Information provided by Plaintiff and Class Members to their identities. The Google Tracking Tools on the Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

99.     In their default state, the Tracking Tools record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage. Here, Defendant purposely configured the Website and the Tracking Tools so that they collect and transmit additional user data, including the specific actions that Plaintiff and Class Members took while requesting appointments and their names and email addresses. For an unknown reason, even though ASD discloses names and email addresses, it does not disclose phone numbers, showing that ASD is capable of excluding PII when it wishes to do so and supporting an inference that its disclosures are purposeful. The operation of the tracking tools is discussed in more detail in the next section.

100.    ASD intercepts and discloses this same data to Meta through its Meta Pixel Tracking Tool. ASD also discloses a user's name, email address, and the fact that they took the action of scheduling an appointment for a consultation to be evaluated for ASD's sleep apnea device.

101.    For example, in screen shot below shows the information disclosed to Facebook after clicking the "Verify My Coverage" button when a user entered the name "Test Test" and email address "test@test.com":

| dl | https://www.americansleepdentistry.com/teleHealthConfirmation?e=19F00633CB7760&leadd=503858&email=test@test.com&name=Test%20Test&action=schedule&type=vsc |
| rl | https://www.americansleepdentistry.com/scheduleTeleHealth;jsessionid=8A0C8B4F9D20C0B6865F9B09C69D01E6 |

**Figure 4***: Disclosure sent to Meta containing the patient's full name and email address.*

102.    As shown, the disclosure made to Meta also contains the patient's full name and email address, and also informs Meta of patients' PHI: that a person, identified by name and email address, was making an appointment with ASD to evaluate treating their actual or suspected sleep apnea with ASD's sleep apnea device.

103.    The full scope of Defendant's use of Tracking Tools is not known, but will be borne out in discovery.

###    i.    ASD's Deceptive Cookie Banner

104.    ASD's Website presents a cookie consent banner to patients. This cookie consent banner purports to allow a user the option to disable functional cookies, performance cookies, and targeting cookies. In reality, it does not.

/

/

/

/

/

/

/



**Figure 5***: The consent banner, which does not block a user's view or use of the scheduling screen.*

105.    First, ASD does not even present this banner until after it has already disclosed the user's Sensitive Health Information—indeed, the banner does not appear until the user reaches the page to schedule their appointment, after ASD has already disclosed their names and email addresses to Google and Meta.

106.    Second, the banner does not prevent the user from interacting with other website elements, like most similar privacy banners. And, if a user clicks anywhere other than on the banner, it immediately disappears. If this happens, ASD continues its tracking as if the user had consented to tracking. These actions are, at the very least, inconsistent with ASD's promise that it

will "require … signed authorization" before making disclosures which are not covered by ASD's privacy policy.[49]

107.    Third, the banner does not inform a reasonable internet user of the tracking alleged in this complaint. The banner warning does not inform patients that their name and email address has *already* been disclosed, and ASD's privacy policy reassures patients that personally identifiable information will be kept private.

108.    Fourth, though the privacy banner contains a "Reject All" button, pressing this button does not **actually cause the Website to stop tracking the user**. For example, the transmissions shown in Figures 6 and 7 below show transmissions made from the same section of the Website captured with and without selecting "Reject All" on the privacy banner. They are identical.



**Figure 6***: Screenshot of a portion of the information disclosed to Google before clicking "Reject All"*

**Figure 7***: Screenshot of a portion of the information disclosed to Google after clicking "Reject All"*

---

[49] *See* Notice of Privacy Practices, *supra* n.6.

109. Thus, Defendant's privacy banner not only fails to allow for secure communications, it actually lures users into making unsecure communications that they have been falsely told to be secure.

110. After a user makes a cookie selection or clicks to dismiss the cookie banner, Defendant continues to present an option for the user to modify their cookie selection. Figure 8, below, shows the options presented to the user.



**Figure 8**: *Defendant's Privacy Preference Center popup.*

111.    Like the shorter cookie banner, this banner does not inform users that ASD will disclose their names and email addresses to Google and Meta. Instead, the banner attempts to trivialize cookies and make users more comfortable providing consent to their use.

112.    These statements are so misleading as to make any purported consent invalid. Even if a user provided consent under this banner, that consent would not cover the tracking performed by ASD.

**F. DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT**

> **i.    Defendant failed to inform Plaintiff and Class Members of its disclosure of Plaintiff's and Class Members' Sensitive Health Information.**

113.    Defendant *never* informed Plaintiff or Class Members that it was sharing their personally identifiable Sensitive Health Information with third parties, including Google and Facebook.

114.    By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

115.    Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as Google and Facebook to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

> **ii.    The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members**

116.    The Tracking Tools installed on the Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way

34

for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiff and Class Members, were unable to detect the Tracking Tools on the Website.

117. Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

118. Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

119. Because Plaintiff and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to the Google and Facebook, they could not and did not consent to Defendant's conduct.

## G. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES

### i. Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Health Information.

120. As explained, *supra*, users of the Tracking Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing the Tracking Tools on their website.

121. Upon information and belief, Defendant, as a user of the Tracking Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google and Facebook to collect Plaintiff's and Class Members' Sensitive Health Information.

ii.    **Plaintiff's and Class Members' Data Had Financial Value**

122.    Moreover, Plaintiff's and Class Members' Sensitive Health Information has value and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiff and the Class.

123.    According to Facebook's annual report, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[50]

124.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

125.    Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[51] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[52]

---

[50] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited June 25, 2026).

[51] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[52] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

126.   Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information. Plaintiff does not find the market value of his health information sufficient to induce him to participate in this market willingly. Yet Defendant made him a participant nonetheless, and deprived him of even the market value.

127.   Moreover, should Plaintiff ever wish to participate in the sale of his data, the unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiff and Class Members.

## H. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA

### i. The HIPAA Privacy Rule

128.   The disclosure of Plaintiff's and Class Members' Private Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[53]

129.   The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by covered entities.

130.   These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google or Facebook account) to identify a

---

[53] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html  (last visited June 25, 2026).

single individual.[54]

### ii. Defendant Collected IIHI from Plaintiff and Class Members and Transmitted it to Unauthorized Third Parties

131. The Sensitive Health Information that Defendant disclosed to unauthorized third-parties through the Tracking Tools—including the drugs Plaintiff and Class Members are prescribed, the means by which they pay for these prescriptions, their specific medical conditions, and their patient statuses—is undoubtedly IIHI.

132. Under HIPAA, IIHI is any information that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103. Plaintiff's and Class Members' Sensitive Health Information, which includes names, email addresses, combined with the fact that they seek to use Defendant's product to treat sleep apnea, constitutes IIHI.

### iii. Defendant's Use of the Tracking Tools Violates HIPAA

133. While healthcare entities regulated under HIPAA may use third-party tracking

---

[54] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited June 25, 2026) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

134.   Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are ***not*** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent.

135.   Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA* Covered *Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[55]

136.   Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[56]

137.   Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

138.   The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

---

[55]   *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* HHS, *available online at*: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.

[56]   HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

139.   Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

140.   The HIPAA Privacy Rule requires any "covered entity" to maintain appropriate safeguards to protect the privacy of protected health information, and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

141.   Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it is part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was

treated at a certain clinic, then this information would be PHI."[57]

142.   Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[58]

143.   Here, Defendant provided patient information to third parties in violation of the Privacy Rule.

144.   HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

145.   Defendant further failed to comply with other HIPAA safeguard regulations as follows:

    a.  Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

---

[57]   *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited June 25, 2026).

[58]   *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited June 25, 2026).

b.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c.  Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e.  Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f.  Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g.  Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

## I. PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

146.  At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with medical care.

147.  This expectation comes, in part, from Defendant's Terms & Conditions, which state that Defendant will only share information within specific limits absent signed consent, and in part from the expectations of regular consumers.

42

148. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

149. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[59]

150. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[60] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[61]

151. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

## V.   TOLLING AND ESTOPPEL

152. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of the Tracking Tools onto the Website.

---

[59] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited June 25, 2026).

[60] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[61] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

153. The Tracking Tools on the Website were and are invisible to the average website visitor.

154. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

155. Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on their part.

156. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiff and Class Members, that by using the Website to make an appointment, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google and Facebook.

157. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of their patients' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to their patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

158. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

159. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI.   CLASS ALLEGATIONS

160.   This action is brought by the named Plaintiff on himself behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

161.   The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

All natural persons who used the Website to make an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google and Facebook or any other unauthorized third party.

162.   In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of a separate Pennsylvania Subclass, which is defined as follows:

**Pennsylvania Subclass**

All natural persons residing in the State of Pennsylvania who used the Website to make an appointment, and whose Sensitive Health Information was disclosed or transmitted to a Tracking Tool Provider or any other unauthorized third party.

163.   Excluded from the proposed Class (including the subclass) are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

164.   Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

165.   **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. On information and belief, there are at least 100,000 individuals that have been

impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

166.    **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a.    Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

b.    Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

c.    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

d.    Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health Information was being disclosed without their consent;

e.    Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f.    Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g.    Whether Defendant violated the statutes asserted as claims in this Complaint;

h.    Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i.    Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j.    Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

167.    **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools. Plaintiff is typical of, and represents, a subclass of Website users residing in his home state whose Sensitive Health Information was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

168.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

169.    **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google and Facebook, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

170.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

171. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

172. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f.   Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

173.   Finally, all members of the proposed Class are readily ascertainable. Defendant, Google, and Facebook have access to Class Members' names and other identifying information provided to Defendant through the Website.

## COUNT I
## COMMON LAW INVASION OF PRIVACY
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)*

174.   Plaintiff repeats and realleges the allegations contained in paragraphs above as if fully set forth herein.

175.   Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

176.   Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

177.   Plaintiff and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure, except to the extent necessary to achieve their healthcare goals.

178.   Defendant's interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class

Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

179.    Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties, and Defendant reinforced that expectation with its Terms & Conditions.

180.    Defendant's disclosure and publicization of Plaintiff's and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

181.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

182.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

183.    Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

184.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

185.    Plaintiff also seeks such other relief as the Court may deem just and proper.

### COUNT II
### BREACH OF CONFIDENCE
*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)*

186.    Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

187.  Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential.

188.  Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on the Website.

189.  Contrary to its duties as medical providers and its express promises of confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiff's and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendant to third parties, including Google and Facebook.

190.  Defendant's disclosures of Plaintiff's and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were unprivileged.

191.  The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

192.  As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

   a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

   b. Defendant eroded the essential confidential nature of the provider-patient relationship;

   c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensating Plaintiff and Class Members for the data;

   d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

e. Defendant's actions diminished the value of Plaintiff's and Class Members' Sensitive Health Information, and

f. Defendant's actions violated the property rights Plaintiff and Class Members have in their Sensitive Health Information.

193. Plaintiff and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiff is also entitled to punitive damages.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)*

194. Plaintiff repeats and realleges allegations contained in the foregoing paragraphs as if fully set forth herein.

195. Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential, which creates a special relationship between Defendant and Plaintiff.

196. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardians of Plaintiff's and Class Members' Sensitive Health Information, Defendant became fiduciaries by their undertaking and guardianship of the Sensitive Health Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Sensitive Health Information; (2) to timely notify Plaintiff and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and do store.

197. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with their patients and former patients, in particular, to keep secure their Sensitive Health Information private.

198.    Defendant breached its fiduciary duties to Plaintiff and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, and separately, by failing to notify Plaintiff and Class Members of this fact.

199.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT IV
### NEGLIGENCE
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)***

200.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

201.    Through their use of the Website, Plaintiff and Class Members provided Defendant with their Sensitive Health Information, believing such information would be kept confidential.

202.    By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

203.    Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google and Facebook.

204.    Defendant further negligently omitted to inform Plaintiff and the Class that they would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

205.    Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Health Information to Defendant had they known that

Defendant intended to use that Information for unlawful purposes.

206. Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

207. Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

208. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; and (ii) submit to future annual audits of those systems and monitoring procedures.

**COUNT V**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)***

209. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

210. Plaintiff and Class Member conferred a monetary benefit on Defendant in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

211. Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

212. In particular, Defendant enriched themselves by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Health Information, and by saving the costs it reasonably

54

should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Health Information.

213. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its patients' Sensitive Health Information.

214. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

215. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

216. Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of direct money damages.

217. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

218. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**COUNT VI**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1), *ET SEQ.***
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)***

219. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

220. The ECPA protects both sending and receipt of communications.

221. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

222. The transmissions of Plaintiff's Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

223. <u>Electronic Communications</u>. The transmission of Sensitive Health Information between Plaintiff and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

224. <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

225. <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or

56

other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

226.   Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.   Plaintiff's and Class Members' browsers;

b.   Plaintiff's and Class Members' computing devices;

c.   Defendant's web-servers; and

d.   The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

227.   By utilizing and embedding the Pixels on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

228.   Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, read, and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as Google and Facebook.

229.   Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including their actual or suspected sleep apnea and their interest in using Defendant's product to treat their symptoms.

230.   By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

57

231.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

232.    <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

233.    The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

234.    Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class.  However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exemption.

235.    Defendant's acquisition of sensitive communications that were used and disclosed to Google and Facebook was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

  a.  Invasion of privacy;
  b.  Breach of confidence;
  c.  Breach of fiduciary duty; and
  d.  Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3)

236.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Private Information with Google and Facebook and other third-parties that (a) did not participate in these communications, (b) Plaintiff and Class Members did not know were receiving their Sensitive Health Information, and (c) Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

237.    As such, Defendant cannot viably claim any exception to ECPA liability.

238.    Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

b.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Website, without providing any value or benefit to Plaintiff or Class Members;

c.    Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

d.    The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

239.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Health Information for financial gain.

240. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

241. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

242. Any purported consent that Defendant may claim to have received from Plaintiff and Class Members was not valid.

243. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

244. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT VII**
**VIOLATIONS OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT ("WESCA"),**
**18 PA. C.S. § 5701, *ET SEQ.***
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)***

245. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

246. 18 PA. C.S. § 5703 provides that it is a criminal act if a person "(1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication; (2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived

therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or (3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication."

247. 18 PA. C.S. § 5747(a) provides for a civil cause of action, whereupon the aggrieved person may, "in a civil action, recover from the person or entity which engaged in the violation such relief as may be appropriate."

248. WESCA defines "intercept" as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 PA. C.S. § 5702. And "contents" is broadly defined as "any information concerning the substance, purport, or meaning of that communication." The use of the Tracking Technologies to immediately transmit, in real time, the substance of Plaintiff's and Class Members' communications constitutes an "intercept[ion]."

249. WESCA defines "electronic, mechanical, or other device" as "any device or apparatus … that can be used to intercept a telecommunication or oral communication …" 18 PA. C.S. § 5702.62 Plaintiff's and Class Members' browsers and devices, Defendant's web server, and the Tracking Technologies at issue each constitute a "device" within the meaning of WESCA.

250. By utilizing and embedding the Tracking Technologies on the Website, Defendant willfully intercepted, endeavored to intercept, and procured another person to intercept, the telecommunications of Plaintiff and Class Members, in violation of WESCA.

---

[62] The definition also includes exceptions not applicable here.

251. Specifically, Defendant intercepted Plaintiff's and Class Members' telecommunications via the Tracking Technologies, which tracked, intercepted, and unlawfully disclosed Plaintiff's and Class Members' sensitive information to third parties such as Google and Meta to use for their own purposes. The intercepted communications include, but are not limited to, communications to and from Plaintiff and Class Members regarding their HIPAA-protected health records.

252. By willfully disclosing or endeavoring to disclose the telecommunications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of telecommunications, Defendant violated 18 PA. C.S. § 5703(2).

253. By willfully using, or endeavoring to use, the contents of the telecommunications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of a telecommunication, Defendant violated 18 PA. C.S. § 5703(3).

254. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

255. Defendant did not obtain consent from Plaintiff or Class Members prior to intercepting their telecommunications, but WESCA requires "all parties to the communication" to give prior consent to any interception. 18 PA. C.S. § 5704(4). Any purported consent that Defendant may claim to have received from Plaintiff and Class Members was not valid.

256. As a result of Defendant's violation of WESCA, Plaintiff and Class Members are entitled to all damages available under 18 PA. C.S. § 5725(a), including actual damages but not less than liquidated damages computed at a rate of $100 per day for each day of violation or $1,000,

62

whichever is higher; punitive damages; reasonable attorney's fees and other reasonable litigation costs incurred.

## COUNT VIII
### FRAUD
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Pennsylvania Subclass)***

257.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

258.    Pennsylvania follows the Second Restatement of Torts to define fraud.

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

Restatement (Second) of Torts, § 525.

259.    ASD presents users with a consent banner which contains misrepresentations of fact. These representations include, but are not limited to:

a.    That the information in cookies "does not usually directly identify" internet users, when in fact many cookie identifiers uniquely identify internet users in the same way that a social security number identifies U.S. Citizens;

b.    That a user could "choose not to allow" functional cookies, performance cookies, and targeting cookies by clicking on the "Reject All" button offered by ASD, when in fact targeting cookies including Google Analytics and Google Ads continue to operate on the Website after making the selection;

c.    That the information about users stored in cookies "is mostly used to make the site work as you expect it to," when in fact many cookies, and most of the cookies ASD purports to allow users to "choose not to allow," are used to improve the internet experience for advertisers, not for users.

63

260. Each of these representations is false. And, upon information and belief, ASD knew each representation was false at the time that the representations were made.

261. Internet developers are commonly aware that cookies are often able to directly identify internet users. Moreover, for the type of tracking cookies Google and Facebook develop, individuals experienced in internet technology commonly know that the purpose of these cookies is to individually track internet users. Defendant, as the owner and operator of a website with a cookie banner, clearly has significant knowledge of internet technologies. It is unlikely that Defendant procured such knowledge without also learning about how cookies are used. Accordingly, it is most likely that Defendant was aware that the information in cookies often directly identifies internet users, it is most likely that Defendant was aware that their statement that the information in cookies "does not usually directly identify" internet users was false.

262. There is no apparent reason for Defendant to have falsely represented to users that the information in cookies does not usually directly identify internet users, other than to induce internet not to disable cookies, and in turn, to allow Defendant to continue to intercept and track their communications, under the false pretense that the information is not identifying. But not only are cookie identifiers often directly identifying, but the specific cookie identifiers used by Google and Meta to support their tracking tools are typically individually identifying, and are present on Defendant's website.

263. Defendant, as the owner, operator, and developer of its website, created the consent banner. In software development, including website development, it is common to test features on a website to ensure they operate properly. Moreover, it is common to test features in a "testing" website before presenting them to customers on the "production" or "real" website. Upon information and belief, Defendant followed this common trend, and was aware that the "Reject

All" feature of its website do not work, and was aware that they did not work at the time the button was first deployed. Accordingly, Defendant was aware that its representation that a user could "choose not to allow" these cookies was false at the time it was made.

264. There is no reason for Defendant to have knowingly offered a broken "Reject All" button to users other than to induce them to continue using the Website in reliance upon Defendant's promise that their choice to reject certain cookies would be honored. Accordingly, upon information and belief, Defendant presented this fraudulent misrepresentation of fact to induce users to continue using the website while falsely believing that Defendant would honor their privacy preferences.

265. Finally, Defendant, as the developer of the Website, is aware that there are many technologies available to "make the site work as [users] expect it to," including multiple options to save session state without the use of cookies. However, cookies are among the few technologies that are most frequently used to surveil and track internet users, making the internet work as advertisers want it to, not as ordinary internet users want it to. And, in fact, most internet users are surprised by the scope of tracking which occurs on the internet. By falsely representing that the cookies on the Website mostly improve functionality expected by users, when in fact cookies on the Website are used to intercept users' communications and share their private information with third parties, Defendant made a false statement and/or a knowing omission.

266. There is no reason for Defendant to have falsely stated that cookies are used mostly to make the site work as users expect it to or for it to have falsely omitted any discussion of tracking cookies, other than to induce patients to continue using the Website under false pretenses.

267.   A reasonable internet user should be able to rely upon such promises when made by seemingly reputable websites, like Defendant's website used to refer patients for its medical product. Thus, Plaintiff's and class members reliance upon the consent banner is justifiable.

268.   For at least the reasons discussed above, ASD is liable for all damages resulting from the loss of Plaintiff's and Class Members' information based on ASD's use of the fraudulent consent banner, because they were either deceived into believing that Defendant would not track their personal information because tracking was disabled, or because they were deceived into believing that Defendant would not track their personal information because Defendant's website did not engage in such tracking. No matter which option a user selected, Defendant's continued interception and disclosure of their personal information, despite Defendant's promises and its consent banner, was fraudulent.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, on behalf of himself and other Class Members, pray for judgment against Defendant as follows:

A.   an Order certifying the Nationwide Class, and Pennsylvania Subclass, and appointing the Plaintiff and his Counsel to represent the Classes;

B.   equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C.   injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.   an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.   an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.      prejudgment interest on all amounts awarded and

G.      all such other and further relief as this Court may deem just and proper.


Dated: July 10, 2026                    Respectfully submitted,

                                        */s/ Alexander Garcia*
                                        Alexander Garcia
                                        **SIRI & GLIMSTAD LLP**
                                        1650 Market St., Ste. 3600 #17136373
                                        Philadelphia, PA 19103
                                        Tel: (212) 532-1091
                                        E: agarcia@sirillp.com

                                        Sonjay C. Singh*
                                        **SIRI & GLIMSTAD LLP**
                                        400 East Pratt Street
                                        8th Floor - #16946751
                                        Baltimore, MD 21202
                                        Tel: (212) 532-1091
                                        E: ssingh@sirillp.com

                                        Zane A. Johnson*
                                        **SIRI & GLIMSTAD LLP**
                                        100 Pearl Street, 14th Floor - # 16946876
                                        Hartford, CT 06103
                                        Tel: (212) 532-1091
                                        E: zjohnson@sirillp.com

                                        **pro hac vice admission anticipated*

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff, on behalf of himself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: July 10, 2026                                     Respectfully submitted,

                                                        */s/ Alexander Garcia*
                                                        Alexander Garcia